

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DEL/MWG/ADR
F. #2020R00637

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 22, 2024

<u>By ECF</u>

The Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Vincent Ricciardo
           <u>Criminal Docket No. 21-466 (S-1) (HG)</u>

Dear Judge Gonzalez:

      The government respectfully submits this letter in advance of sentencing of defendant Vincent Ricciardo, currently scheduled for February 28, 2024. On July 14, 2023, Vincent Ricciardo pleaded guilty to racketeering, in violation of Title 18, United States Code, Section 1962(c), in connection with an extortion and money laundering conspiracy he orchestrated as a captain of the Colombo organized crime family of La Cosa Nostra, as well as other crimes.

      In light of the factors set forth in 18 U.S.C. § 3553(a), the government requests that the Court impose a sentence at the high end of the United States Sentencing Guidelines (the "Guidelines") range set forth in the parties' plea agreement of 63 to 78 months' imprisonment, followed by a term of 3 years' supervised release and $280,890 in restitution to John Doe #1.

I.    <u>Background</u>

      For nearly twenty years, Vincent Ricciardo used his membership in the Colombo crime family to threaten a senior labor union official ("John Doe #1") into paying $2,600 month from his Union salary. After years of timely payments, Vincent Ricciardo was so certain that John Doe #1 would continue to comply that Vincent Ricciardo and other members of the crime family demanded additional monthly kickbacks. When John Doe #1 even appeared uncooperative, Vincent Ricciardo's message to him was clear: Refuse and you will be killed. For instance, in a conversation recorded on June 21, 2021, Vincent Ricciardo said:

      [John Doe #1's] got no choice but to play ball, listen to me . . . listen
      to me, [John Doe #1] knows me 40 years, since he's a baby . . . [John
      Doe #1] knows I'll put him in the ground right in front of his wife
      and kids, right in front of his fucking house, you laugh all you want

pal, I'm not afraid to go to jail, let me tell you something, to prove a point? I would fucking shoot him right in front of his wife and kids, call the police, fuck it, let me go, how long you think I'm gonna last anyway?

When asked why he would resort to killing John Doe #1, Vincent Ricciardo replied, "Well, then they'll know my fucking name every time, every time they hear my name, they'll know it."

In addition to leading efforts to extort and launder money through the Labor Union, Vincent Ricciardo, a four-time convicted felon, also directed other moneymaking ventures for the Colombo crime family: he collected from his crew of associates and members for incarcerated members, he oversaw extortionate loans, he steered others to training schools offering fraudulent Occupational Safety and Health Administration safety certificates, and he plotted to traffic marijuana from Florida to New York. Indeed, his documented association with the Colombo crime family dates back nearly fifty years to 1978, and includes two federal convictions — for extortion conspiracy in 1995, see Presentence Investigation Report dated November 29, 2023 ("PSR") ¶ 250, and racketeering in 2005, id. ¶ 251. Despite battling medical issues for decades (and using these issues to avoid incarceration), Vincent Ricciardo has continued to tirelessly support the aims of the Colombo crime family.

A.   Offense Conduct

Vincent Ricciardo, 78, is a longtime inducted member of the Colombo crime family, a criminal enterprise that engages in violent crime, extortion, loansharking, drug trafficking and fraud, among other things. PSR ¶¶ 17-21. The instant case charged multiple criminal schemes perpetrated by members of the Colombo crime family, and Vincent Ricciardo was a key player in nearly every scheme, as described below.

1.   Extortion/Money Laundering Scheme (Racketeering Acts 1 & 6)

This case arose from an investigation initiated in July 2020 by the Federal Bureau of Investigation ("FBI") and other law enforcement agencies into the extortion of a senior official ("John Doe #1") of a Queens, New York labor union (the "Labor Union") by members of the Colombo crime family. Id. ¶ 8. As described below and in the PSR, the extortion involved threats of violence toward multiple victims connected to the Labor Union and an associated health fund (the "Health Fund"). Id. ¶ 29.

a.   Extortion of John Doe #1 in 2001

Vincent Ricciardo began extorting John Doe #1 for payments in 2001, collecting $2,600 monthly from John Doe #1's salary, which Ricciardo often referred to as a "pension" for himself from the Labor Union. PSR ¶¶ 35-36. Vincent Ricciardo confronted John Doe #1 in the Union offices and demanded $2,600 in cash, and John Doe #1 paid him. The following month, Vincent Ricciardo made the same demand and again John Doe #1 complied. The third month, John Doe #1 attempted to avoid Vincent Ricciardo, but Ricciardo again confronted John Doe #1 and threatened to physically harm him unless John Doe #1 paid him. Knowing of Ricciardo's association with the Colombo crime family and his history of violence, John Doe #1 paid that third

month — and every month thereafter for nearly 20 years — afraid for his own safety and his family's safety. Ashamed of his submission to Vincent Ricciardo's demands for Union money, John Doe #1 worked odd jobs to supplement his income and hid the payments from his family.

Several years after the extortion first began, Vincent Ricciardo was convicted for racketeering (this time, for extorting numerous members of other local labor unions for no-show jobs, see PSR ¶ 251) and went to prison. Still, the extortion of John Doe #1 and the Labor Union continued. While Vincent Ricciardo was incarcerated, his cousin and co-defendant Domenick Ricciardo collected the payments, often also threatening John Doe #1 with violence. It continued that way until 2020. Id. ¶ 36. In that time, John Doe #1 paid more than $600,000 to the members of the Colombo crime family in connection with the extortion. PSR ¶ 47. Bank records obtained from financial institutions since 2010 corroborate these payments. Id.

b.   Vincent Ricciardo's Expansion of Extortion Scheme in 2019

Using the knowledge and experience Vincent Ricciardo gleaned from working for and extorting labor unions for four decades, Vincent Ricciardo concocted a plan to expand the scope of the extortion to include additional kickback payments from the Labor Union for the benefit of the Colombo crime family. Id. ¶ 48.

In January 2020, Vincent Ricciardo and co-defendant Michael Uvino appeared at night, uninvited, at John Doe #1's home. Id. ¶ 37. With members of John Doe #1's family nearby, Uvino and Ricciardo threatened John Doe #1 and demanded he continue to comply with their scheme to extort the Labor Union. Id. Uvino and Ricciardo also questioned John Doe #1 about his salary and benefits as well as the salary and benefits of other employees of the Labor Union and Health Fund. Id. The information they obtained informed the Colombo family's attempts to expand the extortion and to launder the proceeds of the extortion.

In the ensuing months, including during the COVID-19 pandemic, when John Doe #1 was not receiving a salary, the threats and demands continued. For example, in late August 2020, Vincent Ricciardo called John Doe #1 and left two voicemails threatening to come to John Doe #1's home. Id. ¶ 42. In the second voicemail, Vincent Ricciardo said:

> I called you four hours ago. I was hoping you'd call me back. But anyway, okay, you don't want to return my call, I can understand. I don't know why, but anyway, I'll come and see you. I'll try to get there tonight or tomorrow but I'll come and see you.

Id. Shortly thereafter, on another phone call, Vincent Ricciardo and Uvino discussed these voicemails. Id. ¶ 43. Vincent Ricciardo explained that he had called John Doe #1, who had not responded, and "told him I'll see him tonight or tomorrow." After a brief discussion, Uvino responded, "Let these guys, let 'em squirm now tonight . . . ." Ricciardo and Uvino then laughed about John Doe #1 waiting for them in fear.

The following day, on September 1, 2020, Vincent Ricciardo and Uvino personally drove to the Labor Union's office in Queens, New York and repeatedly knocked on a locked door demanding to be let in. Id. ¶ 50. Frightened employees called 911. Id. The caller told the dispatcher, "I can't see them but they are like screaming and banging on the door. . . . I am afraid

to look because they [will] see us." After officers from the New York City Police Department ("NYPD") responded to the emergency call, Vincent Ricciardo and Uvino told the officers they were attempting to collect a check and left. Id. Several hours later, Uvino spoke to Vincent Ricciardo and joked that John Doe #1 and the Labor Union employees "don't feel an air of invincibility anymore."

When John Doe #1, who at this time was cooperating with the FBI, sought to avoid Vincent Ricciardo's increasing demands, Vincent Ricciardo explained, in an intercepted phone call on October 9, 2020, what would happen to John Doe #1 and his family should John Doe #1 not comply:

> Listen to me, listen to me carefully, you listen to me carefully, if I don't hear from you Tuesday, I'll see you and I'll see your wife. I'm a little fucking pissed off right now [first name of John Doe #1], I really am, okay? And I got the right to be pissed off too. Okay? I treat you nothing like a brother and you treat me like a stepbrother, okay?

Id. ¶ 44.

In October 2020, Vincent Ricciardo continued to report the progress of the scheme to the administration of the Colombo crime family, including directly to then-boss Andrew Russo and the family's consigliere Ralph DiMatteo. Id. ¶ 51-54. Ricciardo and Uvino even discussed garnering the support of Theodore Persico, Jr., the incoming boss of the Colombo crime family.

On October 29, 2020 and November 5, 2020, Vincent Ricciardo forced John Doe #1 to meet in person to discuss the Labor Union and plans to expand the scope of the Colombo crime family's involvement in the Union and Health Fund. Id. ¶¶ 55-56. At the direction of law enforcement, John Doe #1 recorded both meetings. On October 29, Vincent Ricciardo demanded more regular "pension" payments. Shortly thereafter, at the November 5 meeting, Vincent Ricciardo met with John Doe #1 and again pressured John Doe #1 to continue his "pension" payments. Vincent Ricciardo also detailed the Colombo crime family's plans to expand the scope of their extortion and control of the Labor Union and Health Fund. Vincent Ricciardo ordered John Doe #1 to hire and employ Co-Conspirator #1 as the assistant administrator to the Health Fund, explaining that Co-conspirator #1 would control the selection of the Health Fund's vendors, forcing the Health Fund to contract with entities and individuals associated with the Colombo crime family. Id. ¶¶ 56-57. Vincent Ricciardo told John Doe #1, "[I]t's my union and that's it, but I call the shots, nobody listens to me they're out of there." Id. During both meetings, Vincent Ricciardo directed Co-Conspirator #1, Domenick Ricciardo, and others to conduct counter-surveillance of the meeting to ensure that John Doe #1 had not alerted law enforcement. Id. ¶ 46.

Vincent Ricciardo later recounted these meetings to Co-Conspirator #1, emphasizing (and mocking) John Doe #1's fear in meeting him and his insistence that they meet in a restaurant. In a May 5, 2021 consensual recording, Vincent Ricciardo explained: "So anyway, [John Doe #1] comes and he meets me. He is deadly afraid. He wants to meet me in restaurant. He is afraid but I told him. The restaurant ain't going to help. If I am going to kill you, you would have been dead already." Id. ¶ 91.

c.    Vincent Ricciardo Seeks to Siphon Funds from the Union

Over the course of the next several months, Vincent Ricciardo forced the hiring and employment of Co-Conspirator #1 as the assistant administrator to the Health Fund.  Ricciardo and the members of the Colombo crime family then used their control over (and Co-Conspirator #1's access to) the Labor Union to put their scheme in motion to replace the Health Fund's vendors and Union's legal counsel with entities beholden to the Colombo crime family and its associates. PSR ¶ 60.  Those entities would negotiate for payments from the Health Fund and then from those payments, would pay at least $10,000 in fees, or "kickbacks," to the crime family.  Id.

To put the selected vendors in place, Vincent Ricciardo recruited co-defendant Albert Alimena as the third-party administrator for the Health Fund and co-defendant Joseph Bellantoni to locate other vendors who would provide kickbacks to the Colombo crime family.  Id. ¶ 62.  Vincent Ricciardo then provided internal, confidential documents belonging to the Labor Union and the Health Fund so that Alimena could "advise" co-conspirators on restructuring specific vendor contracts to facilitate payments to the Colombo crime family.  Id. ¶¶ 63-64, 66-68, 74.

Either from New York or North Carolina, Vincent Ricciardo worked diligently to force the Union and the Health Fund to contract with the selected vendors in order to divert funds to the crime family.  Id. ¶ 61.  On or about December 19, 2020, Vincent Ricciardo drove from New York to North Carolina[1], where he utilized a prepaid "burner" phone so he could continue to communicate with Co-Conspirator #1 and his co-defendants and direct the scheme from North Carolina.  He made clear in intercepted phone calls that he would return to New York if necessary. For example, on January 28, 2021, in a conversation with co-defendant Ralph DiMatteo, the consigliere of the Colombo crime family, Ricciardo reported "things are going slow," he offered to travel back to New York to provide a report to the Colombo crime family's administration, if necessary.  Id. ¶ 64.  Vincent Ricciardo returned to New York on or about March 9, 2021.

In early April 2021, he and Co-Conspirator #1 traveled by plane to Florida to meet with Alimena in person to discuss the scheme.  Id. ¶ 77.  They met in a private backroom of a closed restaurant and Alimena collected and stored their cell phones behind the bar for the duration of the meeting.  Id.  They reviewed paperwork from the Fund and Alimena explained how to receive kickbacks from the Fund's vendors, including by choosing a third-party administrator and healthcare vendors aligned with the Colombo crime family.  Id.  They continued to discuss the scheme to divert money from the Union members, with Alimena making various notes and coaching Co-Conspirator #1 on what documents to request.  Id.  As shown by consensual recordings later that month, Vincent Ricciardo confirmed that Alimena had agreed to provide $10,000 per month to the Colombo crime family if his company (the Dickinson Group) was selected as the third-party administration for the Health Fund. Id. ¶ 87.

---

[1]    From August 4, 2020 through December 19, 2020, and from March 9, 2021 through July 1, 2021, Vincent Ricciardo resided in New York.

In the spring and summer of 2021, due to law enforcement's intervention, the Health Fund did not enter into contracts with the vendors selected by the Colombo crime family. Vincent Ricciardo blamed the delay on John Doe #1. For instance, on May 20, 2021, Vincent Ricciardo stated in reference to John Doe #1, "I'll send someone to his fucking house, I don't give a fuck. I'm telling you they are doing something and they are buying time, time and time. Fucking tired of repeating myself I really am." Ricciardo added, again in reference to John Doe #1, "[w]e will go to his house and break his fucking head." Id. ¶ 91.

Weeks later, on June 18, 2021, in reference to John Doe #1, Vincent Ricciardo again indicated he would resort to violence if his demands were not met, stating, "you're gonna have to be a little more demanding with this kid, if this kid gets out of hand you gotta tell us then we're gonna have to go smack this kid in his head, I don't give a fuck."

On July 1, 2021, Vincent Ricciardo again traveled to North Carolina, where he continued to coordinate the extortion and money laundering scheme with a burner phone, until his arrest in September 2021.

2.   <u>Fraud Workplace Safety Certifications (Racketeering Act 3)</u>

During the investigation of the Colombo organized crime family's extortion of a senior official of a labor official, law enforcement agents uncovered evidence of Vincent Ricciardo's involvement in a scheme to produce fraudulent workplace safety certifications from Occupational Safety and Health Administration ("OSHA"). Id. ¶¶ 102-125. Vincent Ricciardo and those around him often met at the two safety training schools run by co-defendant and Bonanno crime family soldier John Ragano. Among other things, it became rapidly apparent that the schools (which never held training classes) were merely a place for members and associates of La Cosa Nostra to convene, store contraband, and carry out the criminal schemes that are the lifeblood of organized crime.

Rather than hold training classes, the applicants (or their employers) would email, text, or drop-off photocopies of driver's licenses, which co-defendants Ragano, Domenick Ricciardo and corrupt OSHA trainers would then use to complete the necessary OSHA paperwork. After approximately a month, the certification cards would arrive and be distributed to the complicit "students." On some occasions, business owners and construction companies arranged for large groups to be certified without training in order to receive a better price per certification.

In addition to holding meeting at the safety training schools, Vincent Ricciardo also contemplated that when the Colombo family fully controlled the Labor Union's management, the staff of Union and the Health Fund would be required to obtain OSHA certification cards, in part to divert additional money from the union to the Colombo family through the school. In an intercepted communication, Vincent Ricciardo discussed having all the members of Labor Union OSHA-certified. And, in another intercepted communication, Vincent Ricciardo directed an individual to contact Co-Conspirator #1 to obtain a bogus OSHA cards, noting, "Yeah, this way ya don't have to sit there for no freakin' thirty hours." Id. ¶ 125.

3.      Loansharking Schemes (Racketeering Act 4)

Vincent Ricciardo also engaged in an extortionate collection of credit scheme with Uvino, Ragano and co-defendant Thomas Costa.  Id. ¶¶ 126-35.  With Vincent Ricciardo's assistance, Uvino and Ragano provided an individual ("John Doe #2") with two extortionate loans totaling $250,000.  Wiretap interceptions, banking records, consensual recordings and other evidence showed that Uvino provided a $100,000 to John Doe #2; and in exchange John Doe #2 was required to make payments on a weekly basis to Uvino and Ricciardo, which equated to approximately 1.5 percent weekly interest (or "vig") on the $100,000 loan.  Id. ¶ 129.  Wiretap intercepts and consensual recordings further showed that in early 2021, John Ragano made a $150,000 loan to John Doe #2 on the same terms, i.e., 1.5 percent weekly interest on the $150,000 loan, and was required to make payments on a weekly basis to Ragano and Ricciardo.

Vincent Ricciardo collected $500 a week in the loansharking scheme ($200 from the Uvino loan and $300 from the Ragano loan).  More than 40 payments to Vincent Ricciardo are captured in wiretap intercepts and consensual recordings.  These weekly payments did not reduce the principal – a concept Vincent Ricciardo explained to Co-Conspirator #1 in a recorded call on January 26, 2021.  Ricciardo explained, "But you don't know how it works. . . .  The way it works is there's no such thing as, haha, the principal."  Co-Conspirator #1 reiterated, "You pay the juice or you pay the whole thing back, I know that."  Id. ¶ 132.

Vincent Ricciardo and his co-defendants relied on their violent reputations and that of the Colombo crime family to intimidate John Doe #2 into complying with the usurious terms of the loan.  For example, in or about July 2021, Co-Conspirator #1 reported that John Doe #2 was behind on payments.  During this time, Co-Conspirator #1 recorded a conversation in which co-defendant Thomas explained Ricciardo told Costa to give John Doe #2 a "beating" unless he caught up on his payments.  Id. ¶ 134.

B.      Ricciardo's Criminal History and Association with the Colombo Crime Family

Vincent Ricciardo's criminal history begins at age 24 in 1970 when he was convicted of grand larceny in the second degree in Suffolk County (N.Y.) Court in connection with the theft of a tractor trailer and meat.  Id. ¶¶ 246-47.  He was sentenced to one year in custody.  In January 1972, Vincent Ricciardo was convicted in Suffolk County Supreme Court in connection with the forcibly robbery of a drug store and the brandishing of a loaded .32 caliber semi-automatic pistol and a loaded .32 caliber Colt revolver.  Id. ¶ 248.  Ricciardo and two co-conspirators stole $1,100 in the robbery.  Id.  He was sentenced to four years' custody.  Vincent Ricciardo was next charged and convicted in an extortion conspiracy, involving 28 defendants in four mafia families charged with skimming tens of millions of dollars through a 12-year conspiracy to control awarding of window contracts at the New York City Housing Authority between 1978 and 1990.  Id. ¶ 250; see also United States v. Gigante, et al., 90-CR-446 (RJD).  Vincent Ricciardo was then president of a local labor union and used his position to pass along orders from the Colombo crime family to window manufacturers concerning which window installers the crime family expected

to use.  Ricciardo pleaded guilty in 1995 and received a sentence of five years' probation.[2]  The Honorable Raymond J. Dearie also ordered that Vincent Riccardo be subject to the following special conditions:  at least 20 hours of community service per week, home incarceration, no contact (either informal and formal) to any labor organization or members of organized crime.

Just months after his probationary sentence ended, in 2001 and 2002, Vincent Riccardo, who was then a soldier in the Colombo crime family, extorted numerous local unions to secure no-show jobs for associates of the Colombo crime family, for an estimated loss of nearly $300,000, and supervised an illegal gambling business.[3]  Id. ¶ 251; see also United States v. Cacace, 03-CR-191 (S-5) (SJ).  Vincent Ricciardo was convicted of racketeering and sentenced to 42 months' imprisonment and 3 years' supervised release.  On account of his 2005 conviction, Vincent Ricciardo was barred under the Labor Management Reporting and Disclosure Act ("LMDRA") and Employee Retirement Incomes Security Act ("ERISA") from holding any role, representing or consulting with any labor organization or benefit fund for a period of 13 years from November 5, 2008 (the date of his release from his term of imprisonment) through November 5, 2021.

C.    Ricciardo's Medical Condition

Vincent Ricciardo dedicates much of his sentencing memorandum to his ongoing health issues and pretrial confinement on the medical unit at Hudson County Correctional and Rehabilitation Facility, where he claims to have suffered a decline in health.[4]  See ECF Dkt. No. 624 ("Def. Mem.") (Feb. 16, 2024).  However, Vincent Ricciardo suffered from serious health issues long before his arrest in this case and, according to his medical providers and records, many of his claims do not accurately portray his current condition.  Despite Vincent Ricciardo's history of cardiac problems, a representative from the Bureau of Prisons confirmed that Bureau of Prisons can provide appropriate care to the defendant should he be sentenced to a term of imprisonment.

---

[2]    Vincent Ricciardo was originally among the defendants on trial, suffered a heart attack during the trial and later pled guilty to extortion conspiracy.  PSR ¶ 286; see also United States v. Gigante, et al., 90-CR-446 (RJD), ECF Dkt. No. 675.

[3]    Notably, while extorting labor unions for no-show jobs, Vincent Ricciardo also begun to extort John Doe #1 in the instant case, and continued to do so, during his conviction, sentence of imprisonment and term of supervised release, and in the years following.

[4]    The government respectfully requests that a redacted version of this letter be filed publicly, sealing only the portions of this response that may reveal health information protected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") that has not otherwise been disclosed in the defendant's public filings.  See Offor v. Mercy Med. Ctr., 167 F. Supp. 3d 414, 445 (E.D.N.Y. 2016) ("Courts in this Circuit have repeatedly held that information protected by HIPAA is not subject to a First Amendment or common- law right of access and thus have sealed docket entries and redacted documents that contain such information."), vacated in part on other grounds, 676 F. App'x 51 (2d Cir. 2017).

1.  Current Condition



Despite these health, mobility and weight issues, Vincent Ricciardo used threats of violence, his reputation and his ties to organized crime to coordinate and participate in an extortion and money laundering scheme, a loansharking conspiracy, a fraudulent workplace safety scheme, and a plan to traffic marijuana.  He made countless phone calls, traveled significantly and daily by car, and was frequently surveilled driving and meeting with numerous members and associates of La Cosa Nostra and the victims in this case.  He also traveled more than four hours by car to upstate New York multiple times during the investigation to meet with co-defendants and other known members of organized crime.  Vincent Ricciardo drove himself from New York City to Charlotte, North Carolina in March and July 2021, and traveled by plane to meet a co-conspirator in Florida in April 2021. He also drove his family more than eight hours from North Carolina to Florida (and back) to visit relatives in August 2021.

---

[5]      In 1992, Vincent Ricciardo was shot in the lower back by Vito Guzzo, Jr.  In consensual recording on April 11, 2021, Vincent Ricciardo explained to Co-Conspirator #1 that Guzzo, Jr. "[t]ook a 33-year cop out to get off the street 'cause you know I would've killed him. 'Cause he thinks I killed his father."



2.  BOP Findings

   In January 2024, the government provided a representative for the BOP with the last three months of Vincent Ricciardo's medical records (from October 1, 2023 through January 18, 2024) and the medical information contained in the PSR.  Dr. Ellen Mace-Liebson, BOP Acting Regional Medical Director, found that the BOP can provide necessary and appropriate care should he be sentenced to a term of imprisonment.  <u>See</u> January 24, 2024 Letter from the BOP Acting Regional Medical Director, attached hereto as Exhibit C.  Specifically, Dr. Mace-Liebson noted, the defendant will be designated to a medical facility, which provides in-patient care to seriously

ill inmates, or a general population facility, where Vincent Ricciardo would likely be enrolled in the general, cardiac and orthopedic/rheumatology clinics based on his medical conditions and seen as often as medically necessary. Id. at 2-3. Dr. Mace-Liebson confirmed that Vincent Ricciardo's current medications, or their equivalent, are on the BOP's National Formulary, and should he require a different medication going forward, nonformulary requests can usually be accomplished within 36 hours of a clinician's request. Id. at 3. Accordingly, she wrote, "based on the information provided to me and my knowledge of the BOP's medical resources, the BOP is able to provide appropriate care for Mr. Ricciardo should he be sentenced to a term of incarceration and committed to the custody of the BOP." Id.

II.     Procedural History

A grand jury in this District returned an indictment against Vincent Ricciardo and others on September 8, 2021, charging, among other crimes, racketeering, in violation of 18 U.S.C. § 1962(c). On September 14, 2021, Vincent Ricciardo was arrested in North Carolina. He was arraigned before a magistrate judge in the Western District of North Carolina, where he consented to be removed to the Eastern District of New York in custody. Since his removal to New York, Vincent Ricciardo has been incarcerated in the medical wing of Hudson County Correctional and Rehabilitation Center. Since his arrest, he has made multiple applications for bail based on his ongoing medical issues, each of which was denied. The defendant thus has been detained since his arrest.

On April 13, 2022, a grand jury returned a 21-count superseding indictment, which is the operative charging document and contained the same essential counts against Vincent Ricciardo. Ricciardo is charged in all but three counts of the Superseding Indictment. In the Superseding Indictment, Ricciardo is charged with the following crimes: racketeering, in violation of 18 U.S.C. § 1962(c) (Count One); Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Two); Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Three); Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Four); attempted Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Five); conspiracy to commit fraud in connection with means of identification, in violation of 18 U.S.C. § 1028(f) (Count Six); fraud in connection with means of identification, in violation of 18 U.S.C. § 1028(a)(7) (Count Seven); conspiracy to make false statements, in violation of 18 U.S.C. §§ 371 and 1001(a)(2) (Count Eight); extortionate collection of credit conspiracy and extortionate collection of credit, in violation of 18 U.S.C. § 894(a)(1) (Counts Ten and Eleven); conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) (Count Twelve); money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Thirteen); conspiracy to steal and embezzle health care benefit funds, in violation of 18 U.S.C. §§ 371 and 669(a) (Count Fourteen); attempted health care fraud and health care fraud conspiracy, in violation of 18 U.S.C. §§ 1347 and 1349 (Counts Fifteen and Sixteen); violation of disqualification, in violation of 29 U.S.C. §§ 1111(a) and 1111(b) (Count Nineteen); and transportation and possession of ammunition by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Twenty). Vincent Ricciardo is not charged in Counts 17, 18 and 21 of the Superseding Indictment.

On July 14, 2023, Vincent Ricciardo pleaded guilty, pursuant to a plea agreement with the government, to Count One of the Superseding Indictment. As part of the plea agreement,

11

Vincent Ricciardo admitted to the conduct alleged in Racketeering Acts One (extortion conspiracy), Three (conspiracy to commit fraud in connection with identification documents), Four (extortionate collection of credit conspiracy) and Six (money laundering conspiracy) of the Superseding Indictment.  Vincent Ricciardo stipulated to the government's estimated Guidelines calculation of 63 to 78 months (CHC III x Offense Level 24).  He also agreed not to appeal the sentence or conviction should the Court impose a term of 97 months' imprisonment or below.

III.    Guidelines Calculation

The government submits that the following calculation of the Guidelines is correct:

Count One: Racketeering

Racketeering Act 1: Extortion Conspiracy

| | |
|---|---:|
| Base Offense Level (U.S.S.G. §§ 2E1.1(a)(2), 2B3.2(a)) | 18 |
| Plus:  Offense Involved Threat of Bodily Injury (U.S.S.G. § 2B3.2(b)(1)) | +2 |
| Plus:  Loss Greater Than $95,000 (U.S.S.G. §§ 2B3.2(b)(2), 2B3.1(b)(7)(C)) | +2 |
| Plus:  Manager or Supervisor (U.S.S.G. § 3B1.1(b)) | +3 |
| Total: | <u>25</u> |

Racketeering Act 3: Fraud in Connection with Identification

| | |
|---|---:|
| Base Offense Level (§2B1.1(a)(2)) | 6 |
| Plus: Offense Involved More than $250,000 (§2B1.1(b)(1)(G)) | +12 |
| Plus:  Manager or Supervisor (U.S.S.G. § 3B1.1(b)) | +3 |
| Total: | <u>21</u> |

Racketeering Act 4: Extortionate Collection of Credit Conspiracy

| | |
|---|---:|
| Base Offense Level (§2E2.1(a)) | 20 |
| Plus:  Manager or Supervisor (U.S.S.G. § 3B1.1(b)) | +3 |
| Total: | <u>23</u> |

Racketeering Act 6: Money Laundering Conspiracy

| | |
|---|---:|
| Base Offense Level (U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(2)) | 6 |
| Plus:  Intended Loss More Than $150,000 (U.S.S.G. § 2B1.1(b)(1)(F)) | +10 |
| Plus:  Manager or Supervisor (U.S.S.G. § 3B1.1(b)) | +3 |
| Total: | <u>19</u> |

Multiple Racketeering Act Analysis

| | |
|---|---|
| Highest Adjusted Offense Level | 25 |
| Units: | |
| Racketeering Act 1 (§ 3D1.4(a)) | 1 |
| Racketeering Act 3 (§ 3D1.4(a)) | 1 |
| Racketeering Act 4 (§ 3D1.4(a)) | 1 |
| Racketeering Act 6 (§ 3D1.4(a)) | ½ |
| Total Units | 3 ½ |
| Levels Added (U.S.S.G. § 3D1.4): | +4 |
| Less:  Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a), (b)) | -3 |
| Total: | 26 |

In addition, the parties agree that an additional two-level departure is warranted for the case's global resolution by July 15, 2023.  PSR ¶ 272; U.S.S.G. § 5K2.0.

The calculation in the PSR differs in two respects.  The PSR estimates Vincent Ricciardo qualifies for a four-point leadership enhancement under U.S.S.G. § 3B1.1(a).  In the plea agreement, the government estimated Ricciardo's conduct constituted a three-point leadership enhancement.  The government seeks a sentence commensurate with the three-point enhancement.

The PSR also calculates Ricciardo's criminal history as Category II.  The government submits that the defendant in fact has a criminal history score of four, placing him in Criminal History Category III.  This calculation includes not only the November 2003 sentence but also the defendant's June 1995 sentence, for which he received a sentence of five years' probation.  Id. ¶ 250.  Because the government can demonstrate that Vincent Ricciardo's commencement of the instant offense of conviction began in 2001, his 1995 felony conviction was imposed within the 10-year timeframe prescribed by the Guidelines and properly receives one criminal history point.  U.S.S.G. § 4A1.2(e)(1); see also United States v. Napoli, 179 F.3d 1, 17 (2d Cir. 1999).  In his executed plea agreement, Vincent Ricciardo stipulated that his criminal history placed him within Criminal History Category III for purposes of this case.

With an adjusted offense level of 26 and Criminal History III, the applicable Guidelines range of imprisonment is 78 to 97 months (CHC III x 26), and if the Court accepts the additional, two-level departure for global resolution, making the adjusted offense level 24, the range is 63 to 78 months (CHC III x 24).  This is the range the government and the defendant stipulated to in the plea agreement.

IV.     The Appropriate Sentence

A.     Applicable Law

The standards governing sentencing are well-established.  In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and

emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision.  Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

However, that the Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence.  In Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors.  Id. at 596-97.  In so doing, the court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented."  Id. at 590.

The Supreme Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  Id. (noting that a "major departure should be supported by a more significant justification than a minor one").  When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case."  United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009).  Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence."  Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider."  United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

B.    Argument

The government respectfully submits that a sentence at the high end of the Guidelines range set forth in the plea agreement of 63 to 78 months' imprisonment is appropriate

in view of Vincent Ricciardo's role in the serious, long-running scheme to siphon funds from the Labor Union, his lengthy criminal history and repeat recidivism, his clear dedication to a violent organized crime family, the need to protect the public, and the need for deterrence.

      1.    <u>Nature and Circumstances of the Offense</u>

      For nearly 20 years, Vincent Ricciardo ensured that John Doe #1 lived in fear. Vincent Ricciardo, a convicted member of the Colombo crime family with a reputation for violence, showed up at John Doe #1's home and workplace. Vincent Ricciardo left John Doe #1 voicemails threatening late-night visits to him and his family members. Vincent Ricciardo directed others to do the same — accost John Doe #1 in his local grocery store, show up at his door, and send him threatening texts and voicemails. Vincent Ricciardo preyed on this fear to collect money for years — in total, more than $600,000. Then in 2020, Vincent Ricciardo demanded more: the Colombo crime family's use of the Labor Union to implement a money-laundering scheme, where they would receive hundreds of thousands of dollars in kickbacks. Vincent Ricciardo told others what he would do if John Doe #1 refused to comply with his demands – Ricciardo would shoot John Doe #1 in the head while his family watched. Why? Because, as Ricciardo explained, "they'll know my fucking name."

      This conduct warrants a significant term of imprisonment. <u>See</u> 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). Vincent Ricciardo preyed on John Doe #1 for years. He made him believe with his words and his actions that if John Doe #1 disobeyed Ricciardo, that John Doe #1 and his family would be harmed. And, although Vincent Ricciardo never resorted to physical harm against John Doe #1 and his other victims, his threats, backed by the reputation and strength of organized crime, were enough to ensure his victims stayed in line.

      Vincent Ricciardo not only knew about the fear he instilled in John Doe #1; he reveled in it. When telling his co-conspirators about the threatening voicemails or the mandatory in-person meetings, Vincent Ricciardo laughed and mocked John Doe #1. Recounting the November 2020 meeting, the defendant joked that John Doe #1 "is deadly afraid." On April 8, 2021, Ricciardo told Co-Conspirator #1, "Let him go to the police and do whatever the fuck he wants afterwards, I really don't care."

      Vincent Ricciardo's actions caused psychological, financial and reputational harm to John Doe #1. By the time of his arrest, Vincent Ricciardo had stolen more $600,000. He also forced John Doe #1 to hire a Colombo crime family associate as an assistant administrator to the Health Fund and involved his workplace and colleagues in a wide-ranging federal criminal investigation.

      Nor was John Doe #1 Vincent Ricciardo's only victim. Ricciardo discussed harming another Health Fund consultant who he blamed for frustrating the extortion and money-laundering scheme, telling another member of the Colombo crime family in mid-October 2020: "I got every[thing], I got where he lives, his social security number. He lives in his house, his wife's social security number. Big house." He also specified workers whom he would fire or cut their pay once the Colombo crime family was firmly entrenched in the Union. He also collected $500

15

a week from John Doe #2, and when these payments were late, recommended giving John Doe #2 "a beating." The serious, long-running nature of his crimes warrant a term of incarceration.

### 2.    Defendant's History and Characteristics

Vincent Ricciardo's history and characteristics also demonstrate that a significant term of imprisonment is warranted here. See 18 U.S.C. § 3553(a)(1). This is Vincent Ricciardo's third federal conviction involving labor racketeering in 30 years. In 1995, he was directed to sever formal and informal ties with Labor Unions. In 2005, he was barred by law from involvement with Unions. Yet, for decades, he extorted a senior official at a Labor Union and shortly before his debarment was to expire, began using the Union and the Health to benefit the Colombo crime family.

Since 1978, Vincent Ricciardo has repeatedly violated the law to further the aims of the Colombo crime family. Indeed, his own documented membership in the crime family goes back more than three decades. His involvement with the Colombo crime family continued upon his release from Probation in 2000, and again in 2008 after serving several years in prison.

His prior criminal conduct is significant because it indicates even imprisonment will not deter Vincent Ricciardo. His prior sentences did not deter Ricciardo from extorting Union officials — for the third time. His prior sentences did not deter Vincent Ricciardo from his decades-long commitment to a violent criminal enterprise. To the contrary, Ricciardo not only continued to associate with members of organized crime, but he came to the senior leadership with a plan on how to siphon illegal payments from the Labor Union.

### 3.    Affording Deterrence and Protecting the Public

Given Vincent Ricciardo's commitment to the Colombo crime family and his return to criminal activity, a Guidelines sentence is also necessary to afford adequate deterrence to criminal conduct and to protect the public. 18 U.S.C. § 3553(a)(2)(B), (C).

General deterrence warrants a significant sentence. Vincent Ricciardo promoted and furthered the aims of the Colombo crime family, a pernicious criminal organization whose substantial influence in the labor industry and the New York City community still persists. Vincent Ricciardo played a key role in the scheme to steal hundreds of thousands of dollars from Union members and their employers for the benefit of the Mafia. Indeed, a significant sentence is important to acting as a general deterrent to others who, like Vincent Ricciardo, would seek to enrich themselves and their organization at the expense of Union members through widespread corruption.

Specific deterrence also warrants imprisonment, despite the defendant's claims that his health would prevent him from engaging in future criminal activity. As explained below, Vincent Ricciardo has made such claims before and continued to commit the same crimes on behalf of the Colombo crime family. Indeed, not even his imprisonment from 2005 to 2008 prevented him from directing others to collect his "pension" from John Doe #1. Nor is house arrest

in North Carolina, a place where he already demonstrated he could direct others by telephone to carry out his various schemes, a viable solution.

### 4.  Promoting Respect for the Law and Providing Just Punishment

The sentence must also promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A).  A sentence of imprisonment will send the message to the victims in this case and the broader community that long-running criminal schemes that gross hundreds of thousands of dollars will be punished, even if the participants undertake these schemes while having serious health conditions.

### 5.  The Court Should Reject Ricciardo's Request for a Time-Served Sentence

Vincent Ricciardo argues that the Court should sentence him to time-served because of his medical conditions (Def. Mem. at 4-6), the conditions on the Hudson medical unit (id. at 6-7), his family circumstances (id. at 7-11), and his charitable works (id. at 11-12).  None of these factors weigh in favor of a below-Guidelines sentence, much less a sentence of time served.

#### a.  Medical Condition

While the government recognizes that the defendant has serious health issues, these issues do not warrant a time-served sentence.  As explained, upon review of his medical conditions, a medical representative for the BOP believes the BOP can appropriately care for Vincent Ricciardo during a term of custodial imprisonment.  The fact that Hudson has been able to care for the defendant since his incarceration in September 2021 serves to reinforce Dr. Mace-Leibsman's opinion that BOP will be able to provide adequate medical care.

It is also significant that Vincent Ricciardo suffered from these serious health issues while he committed the crimes at issue here.  In fact, Ricciardo has blatantly stated that his own infirmities might only motivate him to act more violently, telling Co-Conspirator #1, "I'm not afraid to go to jail . . . how long you think I'm gonna last anyway?"

Notably, Vincent Ricciardo has previously highlighted risks to his health to escape a sentence of incarceration.  In 2005, Vincent Ricciardo pleaded guilty to racketeering, related to the extortion of two local unions of positions and benefit plans contributions, among other acts. See United States v. Cacace, No. 03-CR-191-SJ (E.D.N.Y.).  Prior to sentencing in that matter, the defendant submitted a sentencing memorandum seeking a non-custodial sentence on the basis of his "deteriorating health and the likelihood that incarceration will hasten his death."  Exhibit D at 1.  In his sentencing memorandum, Vincent Ricciardo's attorney repeatedly argued that incarceration for any length of time would "at best be life-threatening, and in all likelihood will cause Vincent's death.  At the very least, it will undoubtedly shorten his life."  Id. at 27.  In that case, the Honorable Sterling Johnson rejected the defendant's application for a downward departure/variance and sentenced the defendant to 42 months' imprisonment and three years' supervised release—the middle of the defendant's 37 to 46 month range under the United States Sentencing Guidelines.  No. 03-CR-191-SJ (E.D.N.Y.), Dkt. No. 612.  The defendant served his custodial sentence and was released to supervision in 2008.

b.      Conditions at Hudson

Vincent Ricciardo also seeks a time-served sentence based on the conditions at Hudson medical unit during his pretrial detention and the purportedly poor medical care he received there.  Information provided by his medical provider and medical records show many of his claims are exaggerated, misleading or patently false.

By way of background, Vincent Ricciardo is housed in Hudson's infirmary, where he is seen multiple times a day by Hudson's medical professionals, who document Vincent Ricciardo's daily status, medication dosages, and record of treatments and tests conducted by Hudson, specialists and local emergency room physicians (since October 2021, this amounts to tens of thousands pages, many of which have been provided to defense counsel over the course of this case).  His claims in his sentencing memorandum are not borne out by these records.

Vincent Ricciardo claims he has experienced delays in getting his medication refilled.  Def. Mem. at 6.  However, information from his medical provider, corroborated by his medical records, show that this issue was remedied in 2022.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ After initial difficulties dispensing his medications in 2021 upon his arrival at Hudson, given the number of pills and the dosage instructions, Vincent Ricciardo was provided his medication in larger quantities directly, a designation known as Keep on Person ("KOP").  Notably, according to medical staff, Vincent Ricciardo is only inmate in the Hudson facility whose prescriptions are entirely KOP.  According to Hudson staff, he has been assigned a pharmacy technician to work with directly, and is encouraged to also communicate directly with the head doctor and/or nurse.  A Hudson medical provider stated Vincent Ricciardo has never gone weeks without his medications — should he run out, the pharmacy delivers next-day.  His recent medical records show no reports of supply issues, but instead, confirmation from the defendant himself that his medication is in order.  Ex. B at 8, 118, 136, 151.

Vincent Ricciardo states he has had no social visits at Hudson.  Def. Mem. at 5.  He fails to mention he is approved (and medically cleared) for social visits, should he wish to have them. Moreover, according to letters submitted in conjunction with his sentencing memorandum, Vincent Ricciardo has communicated with his family by video and phone from Hudson.

Vincent Ricciardo claims he has no access to healthy meals, often eating bologna and hot dogs.  Def. Mem. at 6.  According to information from his medical provider, the meals at Hudson are approved by the facility dietician and change weekly.  If Vincent Ricciardo rejects the provided meal (as he has done in the past), he is then provided a "heart healthy" meal.  Moreover, his medical provider stated Vincent Ricciardo often chooses to prepare his own meals from items in the commissary.  Ricciardo also complains about that Hudson has "run out" of their supply of Ensure, a nutritional supplement drink.  Def. Mem. at 7.  According to a Hudson representative, Ensure is currently on nationwide back order and Hudson (and other facilities) have been unable to provide it to any inmates.

Vincent Ricciardo points to the fact he has been sent to outside medical providers 39 times during his stay at Hudson as evidence of his rapid decline at Hudson.  Def. Mem. at 6;

Def. Ex. C. This is misleading. Many of these transports were for check-ups or other routine visits that Vincent Ricciardo would have attended if he was not under pretrial detention ███████ ██████████████████████████████████████████████ For instance, one-quarter of these 39 visits were to monitor Vincent Ricciardo's ████████████████████████. Ex. C (listing 11 visits for cardiology). Indeed, at the time of his arrest, Vincent Ricciardo listed eight treating physicians (PSR ¶ 279), and assuming he saw each doctor twice a year for two years, that would amount to 32 visits.

Vincent Ricciardo was also transported to the local emergency department based on new complaints and claims of pain. However, as his Hudson medical provider explained, Hudson often took a more conservative approach in determining whether or not to send Vincent Ricciardo to the local emergency department. Given his history of cardiac ailments, the medical staff made a determination that they would err on the side of caution and transport him to the emergency department. Indeed, as Exhibit C demonstrates Vincent Ricciardo was evaluated and often returned from these visits on the same day. Rather than showing Vincent Ricciardo's decline, this information highlights the patient-safety approach taken by Hudson's medical staff.

████████████████████████████████████████████████████████
████████████████████ The government respectfully submits the defendant's frequent complaints should not be mistaken for actual evidence of the care he has received. The defendant has a long history of seeking leniency and avoiding detention by pointing to his ill health. This has been the case for more than 20 years. His complaints have been taken seriously by Hudson. BOP promises to do the same. The conditions of his confinement should not cause the Court to deviate from the Guidelines, much less impose a time-served sentence.

c.   Family Circumstances and Charitable Works

Finally, Vincent Ricciardo asks the Court to impose a time-served sentence because of his family circumstances and commitment to charity. As to his charitable works, it appears Vincent Ricciardo has not volunteered for a charity since his second federal conviction in 2005 — almost two decades ago. Therefore, this should not weigh in favor of a non-Guidelines sentence. As to his family circumstances, this investigation revealed that Vincent Ricciardo prioritized the Colombo crime family above his own family. During the 13-month investigation, Vincent Ricciardo spent less than half the time in North Carolina with his family. Instead, he lived in New

---

6



York with his long-time girlfriend and co-conspirator Erin Thompkins and met daily with other members of organized crime. Out of the approximately 407 days of the investigation, Vincent Ricciardo spent approximately 252 days in New York and 155 days with his family. It is disingenuous to ask this Court to prioritize his family when he repeatedly chose not to do so himself.

IV.    Conclusion

For these reasons, the government respectfully requests that the Court impose a sentence at the high end of the 63- to 78-month range of imprisonment set forth in the plea agreement, a term of three years' supervised release and award restitution to John Doe #1 in the amount of $280,890.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    _____/s/_____
Devon Lash
Michael W. Gibaldi
Andrew D. Reich
Assistant United States Attorneys
(718) 254-7000

cc:    Clerk of Court (HG) (by ECF and Email)
Elizabeth Macedonio, Esq. and Karloff Commissiong, Esq. (by ECF and Email)
United States Probation Officer Jeremy Toner and Shayna Bryant (by E-Mail)